IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 12-cv-02013-KLM

ELI LAWRENCE BERNARD,

　　　　Plaintiff,

v.

GROUP PUBLISHING, INC.,

　　　　Defendant.

_____

## ORDER
_____

**ENTERED BY MAGISTRATE JUDGE KRISTEN L. MIX**

　　　This matter is before the Court on **Defendant's Motion for Summary Judgment** [Docket No. 27; Filed May 15, 2013] (the "Motion").  On June 21, 2013, Plaintiff filed a Response [#32].  On July 8, 2013, Defendant filed a Reply [#33].  The Motion is ripe for resolution.  The Court has reviewed the Motion, the Response, the Reply, the entire case file, and the applicable law, and is sufficiently advised in the premises. For the reasons set forth below, the Motion [#27] is **GRANTED**.

## I.  Summary of the Case

**A.    Plaintiff's Claims**

　　　Plaintiff initiated this lawsuit on August 1, 2012, bringing one claim against Defendant, his employer at the time, for an alleged violation of the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.*, (the "FLSA").   *See generally Complaint* [#1].   After his termination on November 29, 2012, *Am. Compl.* [#22] at ¶ 10, Plaintiff filed his First

Amended Verified Complaint [#22] on December 10, 2012, which added a retaliation claim against Defendant pursuant to 29 U.S.C. § 215(a)(3).  Plaintiff seeks monetary damages, reinstatement, costs, and attorney's fees.

## B.    Defendant's Motion for Summary Judgment

In its Motion, Defendant alleges that: (1) Plaintiff's position qualified for the FLSA's administrative exemption, *Motion* [#27] at 21-25; (2) Plaintiff's position as a Multimedia Experience Manager was exempt under the computer professional exemption, *id.* at 25-27; and (3) Plaintiff's role at the company qualified as exempt under a combination of the administrative and computer professional exemptions, *id.* at 27.[1]

In his Response, Plaintiff argues that summary judgment is precluded because there are "numerous disputed factual issues" which require that the case proceed to trial. *Response* [#32] at 1.  Plaintiff also argues that his role at the company did not qualify for either the administrative or the computer professional exemptions. *Id.* at 9-14.[2]  Regarding Plaintiff's primary duties at Defendant, Plaintiff argues that "most of [his] work . . . entailed turning on audio-visual equipment for meetings and constantly helping employees with problems like keeping their printers running."  *Id.* at 14.  Plaintiff further argues that "fully 65% of his work time was spent on tasks for which there is no argument of inclusion under an exemption."  *Id.*

---

[1]   Pursuant to 29 C.F.R. § 541.402, "[c]omputer employees within the scope of this exemption, as well as those employees not within its scope, may also have executive and administrative duties which qualify the employees for exemption under subpart B or subpart C of this part."  29 C.F.R. § 541.402.

[2]   In support of this argument Plaintiff relies on statutory language regarding the computer professional exemption that has since been amended by statute.  *See Response* [#32] at 13 n.34.

In its Reply, Defendant attacks Plaintiff's allegation that certain facts are disputed. *Reply* [#33] at 2-7. Defendant further argues that Plaintiff's reliance solely on his own affidavit (which is not otherwise supported by the record) is insufficient to create disputed issues of fact in order to defeat a motion for summary judgment. *Id.* at 7-8. Defendant also argues that Plaintiff "must do more than provide his subjective interpretation of evidence to the Court; instead, he must actually marshal *admissible* evidence of material facts." *Id.* at 8. Defendant also revisits an argument advanced in the Motion regarding Plaintiff's failure to respond to its Requests for Admission. *Id.* at 9-10.

## II. Standard of Review

The purpose of a motion for summary judgment pursuant to Fed. R. Civ. P. 56 is to assess whether trial is necessary. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Pursuant to Fed. R. Civ. P. 56(c), summary judgment shall be granted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." An issue is genuine if the evidence is such that a reasonable jury could resolve the issue in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 277 U.S. 242, 248 (1986). A fact is material if it might affect the outcome of the case under the governing substantive law. *Id.*

The burden is on the movant to show the absence of a genuine issue of material fact. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670-71 (10th Cir. 1998) (citing *Celotex*, 477 U.S. at 323). When the movant does not bear the ultimate burden of persuasion at trial, the "movant may make its prima facie demonstration [of the absence of a genuine issue of material fact] simply by pointing out to the [C]ourt a lack of evidence for the

nonmovant on an essential element of the nonmovant's claim." *Id.* at 671.  If the movant carries the initial burden of making a prima facie showing of a lack of evidence, the burden shifts to the nonmovant to put forth sufficient evidence for each essential element of his claim such that a reasonable jury could find in his favor.  *See Anderson*, 277 U.S. at 248; *Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1326 (10th Cir. 1999).  The nonmovant must go beyond the allegations and denials of his pleadings and provide admissible evidence, which the Court views in the light most favorable to him.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Panis v. Mission Hills Bank, N.A.*, 60 F.3d 1486, 1490 (10th Cir. 1995) (citing *Celotex*, 477 U.S. at 324).  Conclusory statements based merely on conjecture, speculation, or subjective belief are not competent summary judgment evidence.  *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).   The nonmoving party's evidence must be more than "mere reargument of [his] case or a denial of an opponent's allegation" or it will be disregarded.  *See* 10B Charles Alan Wright et al., Federal Practice and Procedure § 2738 at 356 (3d ed.1998).

## III.  Analysis

As discussed above, a motion for summary judgment must be granted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

## A.  There Are No Genuine Issues of Material Fact

As an initial matter, Defendant offers one hundred allegedly undisputed facts in

support of the Motion. *See Motion* [#27] at 2-17. In his Response, Plaintiff includes a chart which purports to challenge certain of Defendants' allegedly undisputed facts.[3] *See Response* [#32] at 3-7. "Whether there is a genuine dispute as to a material fact depends [on] whether the evidence presents a sufficient disagreement to require submission to a jury or conversely, is so one-sided that one party must prevail as a matter of law." *Reyes v. Snowcap Creamery, Inc.*, No. 11-cv-02755-WJM-KMT, 2013 WL 4229835, at *1 (D. Colo. Aug. 14, 2013) (citing *Anderson*, 477 U.S. at 248).

### 1.    Undisputed Facts

Plaintiff does not challenge the following undisputed facts and the documentary evidence submitted in support of the Motion corroborates them:

### a.    Facts Regarding Plaintiff's Role at the Company

- Defendant "provides ministry resources" for individuals involved in "Christian ministry." *Affidavit of Tiffany Rogers* ("Rogers Aff.") [#27-2] at ¶ 2. Defendant "publishes curriculum, books, magazines, websites, DVDs, CDs, kits, events, online training materials, and more to assist individuals and churches in their ministries." *Id.*

- Defendant hired Plaintiff in August 2005 as a Technology/Multimedia Development Editor in its Products Development Department with a starting biweekly salary of $2,692.31. *Employment Offer Letter* [#27-5] at 1; *see also Pltf's Depo. Trans.* [#27-3] at 54:7-55:2.

- Defendant created the position of Technology/Multimedia Development Editor specifically for Plaintiff because Defendant needed someone who had expertise in the technology used in Defendant's digital products. *Pltf's Depo. Trans.* [#27-3] at 83:11-17.

---

[3] While Plaintiff's chart includes references to the number of each allegedly undisputed fact he is challenging, the Court agrees with Defendant that the references are not all accurate. *Reply* [#33] at 2 n.2. Therefore the Court, like Defendant, has endeavored to reconcile Plaintiff's alleged disputes based on the underlying fact, not the number attributed by Plaintiff in certain circumstances.

- Defendant classified Plaintiff's position as exempt. *Rogers Aff.* [#27-2] at ¶ 9. Such exempt employees are paid a salary and do not receive overtime pay. *Id.* In addition, "exempt employees are not required to work a particular shift, but are able to keep a more flexible schedule." *Id.* at ¶ 11.

- As of September 2008, in his role as Multimedia Experience Manager, Plaintiff was tasked with, among other things:
   (1) applying "technical expertise that focuses on customer satisfaction at the early stages of development of software, multimedia-related products or experiences;"
   (2) using "creative problem-solving skills and innovation to help improve delivery options or technical content provided in [Defendant's] multimedia products/experiences;"
   (3) "[providing leadership] in the development of efficient and effective development processes for all multi-media/software resources;"
   (4) "[c]oordinat[ing] the development and production of multi-media/software resources that are well-developed and customer-friendly;"
   (5) "[g]uid[ing] and monitor[ing] assigned multi-media/software projects through the editing, quality control and production process;"
   (6) "[e]valuat[ing] all multimedia projects, looking for opportunities to improve usability, simplicity of interface and customer-friendly features. Where possible, advocat[ing] for improvements that matter to a majority of our customers;" and
   (7) "provid[ing] 'Tier 2' support for external customers."
   *Pltf's Depo., Ex. C* (September 2008 Job Description) [#27-8] at 1-2; *see also Pltf's Depo. Trans.* [#27-3] at 59:15-60:21 (identifying the September 2008 Job Description and stating that it describes the job he was performing).

- As of September 2010, Plaintiff remained responsible for these tasks. *See generally Pltf's Depo., Ex. D* (September 2010 Job Description) [#27-9]; *see also Pltf's Depo. Trans.* [#27-3] at 61:2-62:11 (identifying the September 2010 Job Description and stating that Plaintiff does not remember any changes in his job as compared with the September 2008 Job Description).

- As of May 13, 2011, Plaintiff remained a Multimedia Experience Manager at Defendant, performing similar tasks as those he performed in that role in previous years. In addition, Plaintiff became responsible for work relating to ebooks and apps for Defendant. *See Pltf's Depo. Trans.* [#27-3] at 62:23-63:22; *see generally Pltf's Depo., Ex. E* [#27-16] (signed by Plaintiff on May 13, 2011); *see also Pltf's Depo. Trans.* [#27-3] at 66:24-67:2 ("Q: What was the purpose of you

guys going back and forth?  To make sure it accurately represented the job you did?  A: Correct.").

- Plaintiff's work for Defendant relating to ebooks and apps consumed approximately 20 hours of his time each week.  *Pltf's Depo. Trans.* [#27-3] at 77:1-8.

- Throughout Plaintiff's employment at Defendant, part of his job was to be available to speak to the various business units about technology that was available.  *Id.* at 83:9-84:1.  Plaintiff was also responsible for quality control of products and handling customer calls regarding those products.  *Id.* at 84:2-14.

- Plaintiff was responsible for quality control of digital products before they were sent to customers.  *Id.* at 87:2-18.

- In addition, Plaintiff was responsible for Tier III customer support which involved dealing with "unknown problems that need[ed] to be researched."  *Id.* at 88:11-15.

- Plaintiff was also tasked with assisting with technological set-up for multimedia events.  *Id.* at 90:15-92:14.

- During his "last three of four years" at Defendant, Plaintiff was responsible for training other employees on various software used by Defendant.  *Id.* at 92:20-93:15.  This included development of training materials.  *Id.* at 93:19-21.

- In 2012, Plaintiff remained a Multimedia Experience Manager at Defendant performing similar tasks as those he performed in that role in previous years with the addition of work relating to development of presentations for certain annual camps.   *See Pltf's Depo. Trans.* [#27-3] at 69:5-70:2; *see generally Pltf's Depo., Exs. F & G* [#27-17] (signed by Plaintiff on March 9, 2011 and July 3, 2012); *see also Pltf's Depo. Trans.* [#27-3] at 70:9-104:4 (discussing Plaintiff's job duties for 2011 and 2012).

- Plaintiff also created the training materials for and presented a training to the "Super-Hero group" which related to trouble-shooting problems when using technology in Defendant's conference rooms.  *Pltf's Depo. Trans.* [#27-3] at 97:6-99:2.

**b.**    **Facts Regarding Plaintiff's Termination**

- On December 1, 2011, Plaintiff was given a written warning regarding

his job performance and placed on formal corrective action. *Pltf's Depo. Trans.* [#27-3] at 107:15-23; *T. Gilmour Aff.* [#27-6] at ¶ 6, *see generally December 2011 Memorandum* [#27-21].

- The written warning stated that Plaintiff must: "meet and exceed the responsibilities as outlined in [his] job description and conduct [him]self in a professional manner. . . . [I]f there isn't immediate and sustained improvement . . . as discussed above, . . . [he] may be subject to further corrective action, up to and including termination." *December 2011 Memorandum* [#27-21] at 3.

- On April 2, 2012, Plaintiff was given a final written warning regarding his job performance. *Pltf's Depo. Trans.* [#27-4] at 124:22-125:17; *T. Gilmour Aff.* [#27-6] at ¶ 9, *see generally April 2012 Memorandum* [#27-22].

- The final written warning stated: "Eli, this is your final written warning, understand that your job with [Defendant] is in jeopardy.  If there isn't immediate and sustained improvement in your behavior as discussed above or any further misconduct, you may be subject to further corrective action, up to and including termination."  *April 2012 Memorandum* [#27-22] at 1.

- Plaintiff was told to provide advance written notice for absences from work. *Pltf's Depo. Trans.* [#27-4] at 158:19-22.

- Defendant's employee handbook also informed all employees that "[v]acation time must be approved in advance by the [employee's] supervisor." *Defendant's Employee Handbook* [#27-24] at 2; *see also T. Gilmour Aff.* [#27-6] at ¶ 10 (stating that Defendant's Employee Handbook [#27-24] is "a true and accurate copy of the Paid Vacations and Time Off page from [Defendant's] Handbook.").

- Plaintiff was aware of a November 20, 2012 meeting for which he was supposed to set up the audio-visual equipment. *Pltf's Depo. Trans.* [#27-4] at 162:17:163:4; *Affidavit of Kristin Kling* ("Kling Aff.") [#27-12] at ¶¶ 8-9.

- On Monday, November 19, 2012, Plaintiff sent an email to certain employees at Defendant stating, "I'll be out of the office, beginning tomorrow through the weekend, enjoying ALL of my kids home for [T]hanksgiving." *Pltf's Depo. Trans.* [#27-4] at 165:16-166:5; *see generally November 19, 2012 Email* [#27-26].

- Plaintiff did not notify his supervisor, Tim Gilmour ("Gilmour"), in

advance that he planned to send this email or take additional days off beyond Thursday and Friday for the Thanksgiving holiday. *Pltf's Depo. Trans.* [#27-4] at 166:6-167:18; *Affidavit of Tim Gilmour* ("Gilmour Aff.") [#27-6] at ¶ 10.

- Plaintiff did not set up any audio-visual equipment for the November 20, 2012 meeting, and he did not arrange for anyone else to do so. *Pltf's Depo. Trans.* [#27-4] at 164:11-16.

## 2.    Sham Factual Disputes

Plaintiff purports to challenge certain allegedly undisputed facts.  However, while Plaintiff purports to challenge these facts, the only support Plaintiff offers to challenge these facts is Plaintiff's June 21, 2013 Affidavit [#32-2] ("Plaintiff's Aff.").  However,

> [u]nsubstantiated and self-serving testimony in an affidavit that contradicts earlier deposition testimony is simply not sufficient under Rule 56(e) to create a genuine issue of material fact and defeat an otherwise supported motion for summary judgment where there is no other corroborating evidence in the record to support this statement.

*Palmer v. Circuit Court of Cook Cnty., Soc. Serv. Dept.*, 905 F.Supp. 499, 505 (N.D. Ill. 1995) *aff'd sub nom., Palmer v. Circuit Court of Cook Cnty., Ill*, 117 F.3d 351 (7th Cir. 1997); *see Reply* [#33] at 4.  Instead, such an affidavit should be disregarded if the Court concludes that it is attempting to create a sham fact issue.  *See Law Co., Inc. v. Mohawk Const. & Supply Co., Inc.*, 577 F.3d 1164, 1169 (10th Cir. 2009); *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 973 (10th Cir. 2001).  To determine if Plaintiff's Affidavit seeks to create a sham fact issue, the Court considers three factors:

> (1) [whether] the affiant was cross-examined during his earlier testimony; (2) [whether] the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence; and (3) [whether] the earlier testimony reflects confusion which the affidavit attempts to explain.

*Id.* (quotation omitted); *see also Gebhardt v. Exide Techs.*, No. 12-3117, 2013 WL

1137011, at *3 (10th Cir. March 20, 2013).  It is clear that during his January 15, 2013

deposition, Plaintiff was subject to examination by Defendant's counsel, Plaintiff had access

to the pertinent evidence at the time of his deposition, and none of the assertions in

Plaintiff's Affidavit are attempts to explain confusion at his deposition.  Thus, the Court finds

that Plaintiff's Affidavit [#32-2] is a sham, and the following facts challenged solely by

statements in Plaintiff's Affidavit which contradict his earlier deposition testimony are

deemed undisputed:

- Fact 11: Plaintiff frequently took advantage of the flexible exempt employee schedule and was often seen coming and going from the parking lot during the day, arriving after 9:00 a.m. for work.  *Motion* [#27] at 2; *see Pltf's Depo. Trans.* [#27-3] at 105:7-20; *see also T. Gilmour Aff.* [#27-6] at ¶ 11.

- Fact 27: Plaintiff was in charge of "Tier III product support," which means he was responsible for addressing customer inquiries about "unknown problems that need to be researched."  When a customer had a question about something that no other product support person could answer, Plaintiff would "research those solutions."  The goal of Plaintiff's research was to find a solution and pass that knowledge on to Tier II support so that in the future they could handle those calls without his supervision.  *Motion* [#27] at 6; *see Pltf's Depo. Trans.* [#27-3] at 88:11-89:24.[4]

- Fact 28: Plaintiff's "Tier III knowledge came from trying to reproduce the problem that the customer was having, and [Plaintiff has] an aptitude for that."  *Motion* [#27] at 7; *see Pltf's Depo. Trans.* [#27-3] at 88:22-25.

- Fact 43: Plaintiff's duties included "product shaping," "visit[ing] with the different business units to help them understand what current technology is available that would impact the product they are trying to develop, how the CD might work, how the menus might run, just to give them the benefit of [his] experience."  *Motion* [#27] at 9; *see Pltf's*

---

[4] The Court notes that Plaintiff's attempt to create a sham fact issue regarding Facts 27-29, 31, 43, 48, and 66 is particularly egregious because these facts contain direct quotations from his deposition transcript.

*Depo. Trans.* [#27-4] at 174:18-24.

- Fact 48: Plaintiff was reassigned to Gilmour and was given the additional responsibility of developing Defendant's apps and ebooks. *Motion* [#27] at 10; *see Pltf's Depo. Trans.* [#27-4] at 174:18-24.

- Fact 51: According to Plaintiff, his key responsibilities were to "coordinate the conversion, compilation of content and metadata, and distribution of at least 50 ebooks through various sales channels, including CDB, Amazon, Istore, etc. on time and within budget" and to "coordinate the development and distribution of 6-10 mobile apps through various available mobile app sales channels on time and within budget." *Motion* [#27] at 10; *see Pltf's Depo. Trans.* [#27-3] at 70:14-71:14.

- Fact 52: Plaintiff was responsible for figuring out how to convert content to the proper format for Amazon ebooks, determining how to place content on Amazon, and then placing content on Amazon. *Motion* [#27] at 10; *see Pltf's Depo. Trans.* [#27-3] at 73:23-74:17.

- Fact 53: Plaintiff was also part of a team that decided how Defendant's mobile apps would function, and he was responsible for finding, vetting, and directing outside developers on bringing those apps to fruition, or in some cases, creating apps himself. *Motion* [#27] at 10; *see Pltf's Depo. Trans.* [#27-3] at 80:1-81:20, [#27-4] at 118:23-121:9.

- Fact 54: Plaintiff also retained his responsibilities for "Traditional Digital Products," which required him to "partner with business team for the full life cycle of digital products: shaping (communicating current available technology), development (managing internal builds for CDs and online distribution as appropriate), quality control (testing prior to ship and release to warehouse), and Tier III product support (troubleshooting issues and reporting resolution scenarios to Tier I and II product support staff)." *Motion* [#27] at 10-11; *see Pltf's Depo. Trans.* [#27-3] at 83:3-84:14.

- Fact 55: Plaintiff continued to be responsible for partnering "with business teams, conference center planners, and the Summit Champion to strategically plan and produce excellent live experiences with multimedia." *Motion* [#27] at 11; *see Pltf's Depo. Trans.* [#27-3] at 90:15-21.

- Fact 56: Plaintiff was also responsible for meeting with the individual in charge of holding a meeting or event at Group's facility, assessing the client's multimedia needs for the event, and then determining how

"to make that happen." *Motion* [#27] at 11; *see Pltf's Depo. Trans.* [#27-3] at 91:1-17.

### 3.   Allegedly Disputed Facts Which Are Not Actually Challenged

Plaintiff also claims to dispute certain allegedly undisputed facts but fails to actually challenge those facts. Therefore, the following facts are undisputed:

- Fact 22: Plaintiff was tasked with overseeing development and production of multimedia projects and ensuring content was delivered to customers in a user-friendly manner. *Motion* [#27] at 5; *Response* [#32] at 3 (admitting that Plaintiff "had limited involvement in development"); *Plaintiff's Aff.* [#32-2] at ¶ 7; *Pltf's Depo. Trans.* [#27-3] at 83:9-85:8.

- Fact 26: Plaintiff checked the products' quality, made sure they "worked like they were supposed to," and performed final technology quality checks to ensure the products that shipped actually matched what he approved. *Motion* [#27] at 6; *Response* [#32] at 3 (claiming to challenge fact 26 but actually attempting to challenge fact 27); *Pltf's Depo. Trans.* [#27-3] at 84:4-10, 87:16-18.

- Fact 29: Plaintiff was the last stop before problems were referred to outside help, such as developers, programmers, and engineers. *Motion* [#27] at 7; *Response* [#32] at 3 (claiming to challenge fact 29 but actually attempting to challenge fact 30); *Pltf's Depo. Trans.* [#27-3] at 89:2-19.

- Fact 30: In addition to his role in product development, Plaintiff was also responsible for helping improve Defendant's overall efficiency by providing "training on universally used software products such as Outlook, Excel, Powerpoint, Word, etc." providing "leadership in improving functionality and efficiencies of forms and processes related to these software programs," and helping in the "development and implementation of software for use by general staff members." *Motion* [#27] at 7; *Response* [#32] at 3 (admitting that Plaintiff "only did training per HR guidelines."); *see Pltf's Aff.* [#32-2] ("I did new employee training following guidelines laid down by HR and content provided by IT. I updated training materials . . ."); *Pltf's Depo. Trans.* [#27-3] at 93:11-15 ("Q: And who created and produced the training material? A: I did.").

- Fact 31: As part of this responsibility, Plaintiff was tasked with providing "monthly new employee technology training" on how to use

various software programs.  *Motion* [#27] at 7; *Response* [#32] at 3; *Pltf's Depo. Trans.* [#27-3] at 92:20-93:3.

- Fact 36: Plaintiff helped organize and support "Internal customers' multimedia experiences re: use of presentation equipment in staff meetings and other meetings as needed." *Motion* [#27] at 8; *Response* [#32] at 3; *Pltf's Depo., Ex. C* (September 2008 Job Description) [#27-8] at 2; *Pltf's Depo., Ex. D* (September 2010 Job Description) [#27-9].

- Fact 37: From time to time, Plaintiff moved speakers, wires, and other equipment to prepare for events at Defendant.  *Motion* [#27] at 8; *Response* [#32] at 3; *Pltf's Depo. Trans.* [#27-3] at 90:24-92:14.

- Fact 38: Others, such as Kristin Kling (an exempt manager), also moved speakers and other equipment when preparing for events. *Motion* [#27] at 8; *Response* [#32] at 4 ("[Defendant's] audio-visual equipment is old, outdated, obsolete, analog equipment that [Defendant] would not upgrade and [Plaintiff] learned to operate years ago.  He was, therefore, the only person who could operate it."); *Kling Aff.* [#27-12] at ¶ 6.

- Fact 39: Plaintiff's knowledge with respect to how to set up and determine the audio visual needs for events was complicated enough that after he was terminated, Defendant's employees have "had to start completely at ground zero because there isn't anyone who knows what Plaintiff did exactly in that area.  So [they've] formed a small team of people to research, watch videos, learn the process. . . . And it's a challenge." *Motion* [#27] at 8 (quoting *Amy Nappa Depo. Trans.* [#27-10] at 19:16-21); *Response* [#32] at 4 ("Conferences were held at least twice a year and [Plaintiff] worked 16-hour days.").

- Fact 40: Approximately twice a year, Plaintiff also assisted with national conferences, during which he, along with a staff of five or six, provided support for the audio-visual and computer needs of presenters. *Motion* [#27] at 8; *Response* [#32] at 4 ("[Plaintiff] was always controlled by supervisors.").

- Fact 42: Plaintiff drafted a document dated January 19, 2011 to his supervisor outlining his job duties as he viewed them at the time. *Motion* [#27] at 9; *Response* [#32] at 4 (claiming to challenge fact 42 but actually attempting to challenge fact 43).

- Fact 47: Gilmour and Plaintiff discussed Defendant's work with apps and ebooks, and they determined Plaintiff's expertise in technology and product development would be beneficial to Defendant's work in this

area.  *Motion* [#27] at 9; *Response* [#32] at 4 (claiming to challenge fact 47 but actually attempting to challenge fact 48).

- Fact 48: Plaintiff was reassigned to Gilmour and was given the additional responsibility of developing Defendant's apps and ebooks. *Motion* [#27] at 10; *Response* [#32] at 4 (admitting that "Gilmour added the Ebook assignment and with it 20 hours per week to [Plaintiff's] workload.").

- Fact 50: Plaintiff's primary responsibilities in 2011 and 2012 included app development, ebook development, training, and digital product development.  *Motion* [#27] at 10; *Response* [#32] at 4 (claiming to challenge fact 50 but actually attempting to challenge fact 51).

- Fact 57: Plaintiff and T. Gilmour met frequently to discuss Plaintiff's workload, and when Plaintiff complained that he had too many responsibilities, Gilmour eliminated Plaintiff's role in assisting with monthly all-staff meetings, because Gilmour wanted Plaintiff to focus more on assignments that required his expertise. *Motion* [#27] at 11; *Response* [#32] at 5 (admitting that there were changes in Plaintiff's workload and not challenging that Plaintiff met frequently with Gilmour, rather alleging that "for the first nine months he worked for Gilmour, Gilmour did not meet with [Plaintiff] for the mandatory 'touchbase' meetings.").

- Fact 61: Plaintiff has never been a part of Defendant's IT department, and it was not part of Plaintiff's job duties to fix general computer problems or provide IT support to Defendant's employees; it is just something he chose to do from time to time, and he spent little time doing it. *Motion* [#27] at 12; *Response* [#32] at 5 (claiming to challenge fact 61 but actually attempting to challenge fact 62).

- Fact 62: Plaintiff was counseled by his supervisors that he should spend less time fixing employee computer problems and more time performing his job duties. *Motion* [#27] at 12; *Response* [#32] at 5 (not disputing this fact, rather offering an excuse regarding why Plaintiff spent time fixing employee computer problems).

- Fact 65: In December 2011, Gilmour began having Touchbase meetings with Plaintiff on a weekly basis. *Motion* [#27] at 12; *Response* [#32] at 5 ("Gilmour failed to follow [Defendant's] policy to have [a]

meeting with [Plaintiff] for the first none [sic] months[5] he supervised [Plaintiff].");  *Pltf's Depo. Trans.* [#27-4] at 123:10-17;  *T. Gilmour Aff.* [#27-6] ¶ 6.

- Fact 66: Touchbase forms are used "[t]o generate a conversation between an employee and a supervisor as to what needs to be done in the upcoming weeks – upcoming five days to ensure that the employee is doing tasks as assigned."  *Motion* [#27] at 12; *Response* [#32] at 5 ("[Defendant's] policy required the employee to prepare the meeting form.");  *Pltf's Depo. Trans.* [#27-4] at 128:14-19.

- Fact 67: Plaintiff drafted the content for his Touchbase forms, and determined which tasks to do in which order and how much time he would spend on each.  *Motion* [#27] at 12;  *Response* [#32] at 5 ("[Defendant's] policy required the employee to prepare the meeting form.");  *Pltf's Depo. Trans.* [#27-4] at 129:12-15.

- Fact 68: Plaintiff "had to decide for [himself] what is in the best interest of Group, and try to get the most important things done first," and he prioritized his activities based on what generated revenue.  *Motion* [#27] at 12;  *Response* [#32] at 5 ("[Defendant's] policy required the employee to prepare the meeting form.");  *Pltf's Depo. Trans.* [#27-4] at 123:18-124:18.

- Fact 72: The reason for the corrective action was Plaintiff's inappropriate behavior, negative attitude, and unprofessional conduct, as detailed in numerous complaints about Plaintiff rolling his eyes and behaving condescendingly during meetings.  *Motion* [#27] at 13;  *Response* [#32] at 6 (claiming to challenge fact 72 but actually attempting to challenge fact 73).

- Fact 73: Plaintiff also had interpersonal conflicts with at least five of Defendant's employees.  For example, he was rude and unprofessional toward coworkers on several occasions, and when Sherri Smith confronted him, he blamed others for his behavior.  *Motion* [#27] at 13;  *Response* [#32] at 6 ("[The r]eal reason was Gilmour's failure to do his job and configure [Plaintiff's] assignments to a manageable workload.");  *T. Gilmour Aff.* [#27-6] ¶ 6;  *see generally December 1, 2011 Memo* [#27-21].

---

[5]  Gilmour became Plaintiff's supervisor in March 2011.  *T. Gilmour Aff.* [#27-6] at ¶ 2. Therefore, Plaintiff's "first n[i]ne months" working under Gilmour were March 2011 through November 2011.

- Fact 74: During the December meeting, Gilmour discussed ways Plaintiff could improve his interactions with Defendant's employees. *Motion* [#27] at 13; *Response* [#32] at 6 ("[The r]eal reason was Gilmour's failure to do his job and configure [Plaintiff's] assignments to a manageable workload.")); *Pltf's Depo. Trans.* [#27-3] at 106:12-107:3.

- Fact 75: The December 1, 2011 Memorandum stated, "if there isn't immediate and sustained improvement . . ., or if there are any other incidents or misconduct, you may be subject to further corrective action." *Motion* [#27] at 13-14; *Response* [#32] at 6 ("[The r]eal reason was Gilmour's failure to do his job and configure [Plaintiff's] assignments to a manageable workload. . . . Subsequent to the December warning, Gilmour signed off on all issues addressed in the warning."); *Pltf's Depo. Trans.* [#27-3] at 108:10-17; *December 1, 2011 Memo* [#27-21] at 3.

- Fact 76: Plaintiff understood that if Tim Gilmour or Rocky Gilmore, Defendant's Chief Operating Officer, perceived any other incidents of misconduct on his part, he could be terminated from his employment at Defendant. *Motion* [#27] at 14; *Response* [#32] at 6 ("Subsequent to the December warning, Gilmour signed off on all issues addressed in the warning."); *Pltf's Depo. Trans.* [#27-3] at 108:18-25.

- Fact 77: During a March 20, 2012 Touchbase meeting, Plaintiff informed Gilmour he had not been performing the regularly scheduled technology training sessions for new hires, which was one of the basic requirements outlined in Plaintiff's job description. *Motion* [#27] at 14; *Response* [#32] at 6 (misstating Fact 77, failing to respond to Fact 77, and inappropriately offering a legal conclusion).

- Fact 80: The April 2012 Memorandum stated: "Eli, this is your final written warning, understand that your job with Group Publishing is in jeopardy. If there isn't immediate and sustained improvement in your behavior as discussed above or any further misconduct, you may be subject to further corrective action, up to and including termination." *Motion* [#27] at 14; *Response* [#32] at 6 ("As requested by Gilmour, [Plaintiff] gave required notice."); *Pltf's Depo. Trans.* [#27-4] at 125:22-126:8; *April 2012 Memorandum* [#27-22] at 1.

- Fact 81: Plaintiff understood at the conclusion of that meeting that his job with Defendant would be in jeopardy if he engaged in any further misconduct as perceived by Tim Gilmour and Rocky Gilmore. *Motion* [#27] at 15; *Response* [#32] at 6 ("As requested by Gilmour, [Plaintiff] gave required notice."); *Pltf's Depo. Trans.* [#27-4] at 126:9-13.

- Fact 82: On October 10, 2012, Plaintiff sent an email to Defendant's employees letting them know he would be out of the office on Thursday and Friday of that week. *Motion* [#27] at 15; *Response* [#32] at 6 ("As requested by Gilmour, [Plaintiff] gave required notice."); *Pltf's Depo. Trans.* [#27-4] at 157:23-158:10.

- Fact 90: Plaintiff never told Kling he would be unable to assist with the November 20 event. *Motion* [#27] at 16; *Response* [#32] at 6 (purporting to challenge fact 90 but instead improperly offering argument).

- Fact 91: On Monday, November 19, 2012, Bernard sent an email to Defendant's employees stating, "I will be out of the office, beginning tomorrow through the weekend, enjoying all of my kids home for Thanksgiving." *Motion* [#27] at 16; *Response* [#32] at 7 (purporting to challenge fact 91 but actually challenging fact 92).

- Fact 92: Plaintiff did not notify Tim Gilmour in advance that he planned to send this email or take additional days off beyond Thursday and Friday for the Thanksgiving holiday. *Motion* [#27] at 16; *Response* [#32] at 7 (offering conclusory statement that Plaintiff "did give required notice" and stating "[Plaintiff] was on vacation. On prior occasions he had come in from vacation to set-up and would have done so this time."); *Pltf's Depo. Trans.* [#27-4] at 166:6-167:18.

- Fact 93: Plaintiff did not set up any audio-visual equipment for the City of Loveland's event, and he did not arrange for anyone else to cover the event. *Motion* [#27] at 16; *Response* [#32] at 7 (not challenging this fact, instead offering an excuse for why Plaintiff did not set up the equipment).

- Fact 97: Gilmour met with Plaintiff and Kling, and Plaintiff admitted he missed the meeting. *Motion* [#27] at 17; *Response* [#32] at 7 (purporting to challenge fact 97 but actually challenging fact 98).

- Fact 98: Tim Gilmour decided to terminate Plaintiff's employment based on his failure to show up for the City of Loveland event, his repeated violations of the call-in policy for vacation time, and his failure to abide by the April 2012 [Memorandum]. *Motion* [#27] at 17; *Response* [#32] at 7 (offering conclusory allegation that Plaintiff "acted in total conformity with [Defendant's] call-in policy").

### 4.      Facts Deemed Admitted

In addition, Plaintiff failed to respond to Defendant's First Requests for Admission to Plaintiff.  *See Motion* [#27] at 17-20; *Response* [#32] at 8 n.10 ("Plaintiff acknowledges that response to certain Requests for Admissions [sic] were not forthcoming.  That failure resulted from [D]efendant's service of the RFAs by email which email was overlooked in the crush of inbox material.");[6] *Reply* [#33] at 9 ("Plaintiff's counsel *never* served responses of any kind.").  Fed. R. Civ. P. 36(a)(3) states "[a] matter is admitted unless, within 30 days after being served, the party to whom the request is directed serves on the requesting party a written answer or objection addressed to the matter . . ."  Fed. R. Civ. P. 36(a)(3).  Fed. R. Civ. P. 36(a)(3) makes clear that unless a response is received within thirty days of a request for admission, each item contained therein will be deemed admitted.  *See Bergemann v. United States*, 820 F.2d 1117, 1120 (10th Cir. 1987) ("Unanswered requests for admission are deemed admitted.").  "The rule is quite explicit that matters shall be deemed admitted unless, within the specified time limits, a written answer is filed or objections made."  8A Charles Alan Wright et al., *Federal Practice and Procedure* § 2259, at 551 (2d ed. 1994).  Plaintiff offers no argument or evidence that he did not receive the Requests for Admission.  The Court has reviewed the Requests for Admission and finds

---

[6] According to Austin E. Smith, counsel for Defendant, he has used the same email address to which the Requests for Admission were sent "to correspond with and/or send documents to counsel for Plaintiff on at least 40 occasions [and has] received at least 35 e-mails from" the same email address, "including e-mails serving Plaintiff's initial disclosures, responses to discovery, and various other documents."  *Affidavit of Austin E. Smith* [#27-38] at ¶ 9.  Mr. Smith also states that he has never received a "bounce-back" email indicating that any emails sent to Plaintiff's counsel were undeliverable.  *Id.* at ¶ 10.  In addition, a paralegal who works for Defendant's counsel states that on April 1, 2013, Plaintiff's counsel's paralegal called her to request that copies of all of Defendant's discovery requests be re-sent to her via email.  *Affidavit of Linda R. Kerman* ("Kerman Aff.") [#27-39] at ¶ 10.  Kerman states that she complied with the request on April 1, 2013.  *Id.*; *see also Kerman Aff., Ex. 1* (April 1, 2013 email).

them to be reasonable.  As such, Plaintiff is deemed to have admitted items 1-13 as set

forth in Defendant's First Requests for Admission to Plaintiff [#27-37].  These include:

- Admit that before you filed this lawsuit you never complained to any more senior member of management or human resources at [Defendant] that you thought your position should be reclassified as non-exempt.

- Admit that you have no evidence that [Defendant] did not act in good faith when it classified your job as exempt under the Fair Labor Standards Act ("FLSA").

- Admit that throughout your employment with [Defendant] you were paid a salary of at least $455 per week.

*Defendant's First Requests for Admission to Plaintiff* [#27-37] at ¶¶ 6, 9, 13.

### 5.   Disputed Fact

As a result, there is only one disputed fact, Fact 41.  Fact 41 states: "Because

[Plaintiff] was 'self-managed,' he determined his own hours and availability during these

conferences."  The conferences referenced in Fact 41 were national conferences that

occurred "[a]pproximately twice a year."  *Motion* [#27] at 8; *see also Sherri Smith Depo.*

*Trans.* [#27-14] at  6:7-9:13 (discussing Simply Youth Ministry Conference, KidMin

Conference, and event called LifeServe for which Plaintiff provided support).  Each

conference required Plaintiff to be onsite for five or six days.  *Sherri Smith Depo. Trans.*

[#27-14] at 7:2-8.

As noted above, summary judgment is appropriate only if there is no genuine issue

of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ.

P. 56(c); *Celotex Corp.*, 477 U.S. at 322.  "A fact is 'material' if it is essential to proper

disposition of the claim under the relevant substantive law."  *Ellis v. J.R.'s Country Stores,*

*Inc.*, No. 12-cv-01916-CMA-KLM, 2013 WL 3661665, at *2 (D. Colo. July 12, 2013) (citing

*Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231-21 (10th Cir. 2001)).  "A dispute is 'genuine' if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party."  *Id.* (citing *Allen v. Muskogee, Okl.*, 119 F.3d 837, 839 (10th Cir. 1997)).  As discussed below, a determination of whether Plaintiff was properly classified as exempt pursuant to either the administrative employee exemption or the computer professional exemption of the FLSA is based on a variety of considerations.  *See* Section B.1., *infra*.  Because the Court should examine "the character of [Plaintiff's] job as a whole," 29 C.F.R. § 541.700(a), the issue of whether Plaintiff was entitled to occasionally manage his own time regarding certain limited tasks is not a genuine issue of material fact as, in light of Plaintiff's other job responsibilities, it could not lead a fact finder to return a verdict in his favor.

### 6.   Undisputed Fact Offered by Plaintiff

In addition to the various undisputed facts offered by Defendant, Plaintiff offers a portion of Gilmour's deposition transcript and an exhibit from that deposition.  *See generally December 1, 2011 Memorandum* [#27-21]; *Gilmour Depo., Ex. 14* [#32-12] (a version of the last page of the December 1, 2011 Memorandum with handwritten notes); *Gilmour Depo. Trans.* [#32-12] at 28:24-29:7.  These documents establish that Plaintiff timely completed all but one of the various expectations set out for him in the December 1, 2011 Memorandum written by Plaintiff's supervisors.  *Gilmour Depo. Trans.* [#32-12] at 29:2-7.  The documents further show that Plaintiff completed the outstanding item within a few days of the established deadline.  *Id.* at 29:11-19.  However, while this fact may provide some information regarding Plaintiff's performance of his job, it does not relate to any of the elements of either of Plaintiff's claims.  *See* Section B, *infra*.  Therefore, the Court finds that

this fact is not a genuine issue of material fact because it could not lead a fact finder to return a verdict for Plaintiff.  *See Ellis*, 2013 WL 3661665, at *2 (citations omitted).

Accordingly, the Court finds that there are no genuine issues of material fact and will, therefore, next consider whether Defendant is entitled to judgment as a matter of law.

**B.     Defendant is Entitled to Judgment As a Matter of Law**

### 1.     The FLSA and Certain Exemptions

The FLSA requires employers to pay their covered employees one and one-half times their regular hourly rate for each hour the employees work in excess of forty hours per workweek.  *See* 29 U.S.C. § 207(a)(1).

### a.     The Administrative Employee Exemption

The FLSA, however, exempts "any employee employed in a bona fide executive, administrative, or professional capacity."  29 U.S.C. § 213(a)(1).  To qualify as a bona fide administrative employee, the employee must be compensated on a salary basis at a rate of not less than $455 per week, his primary duty must be "the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers," and the employee's primary duty must include "the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a).

### b.     The Computer Employee Exemption

In addition, the FLSA specifically exempts "any employee who is a computer systems analyst, computer programmer, software engineer, or other similarly skilled worker."  29 U.S.C. § 213(a)(17); *see also* 29 C.F.R. § 541.400 (stating that computer

systems analysts, computer programmers, software engineers and other similarly skilled workers are exempt under both § 213(a)(1) and § 213(a)(17)).  Section 213(a)(1) "applies to any computer employee compensated on a salary or fee basis at a rate of not less than $455 per week," while section 213(a)(17) "applies to any computer employee compensated on an hourly basis at a rate not less than $27.63 an hour."  29 C.F.R. § 541.400(b).  Both of these exemptions only apply to computer employees whose primary duty consists of:

> (1) The application of systems analysis techniques and procedures, including consulting with users, to determine hardware, software or system functional specifications;
>
> (2) The design, development, documentation, analysis, creation, testing or modification of computer systems or programs, including prototypes, based on and related to user or system design specifications;
>
> (3) The design, documentation, testing, creation or modification of computer programs related to machine operating systems; or
>
> (4) A combination of the aforementioned duties, the performance of which requires the same level of skills.

*Id.*

### c.    Application of the FLSA

The employee bears the burden of proving that the employer violated the FLSA. *Archuleta v. Wal-Mart Stores, Inc.*, 543 F.3d 1226, 1233 (10th Cir. 2008).  However, an employer who asserts that the employee is exempt because he falls within the executive, administrative, or professional exemptions bears the burden of establishing that such category applies.  *Id.*  Further, the exemptions to FLSA's overtime requirement are construed strictly against the employer.  *Id.*  In addition, "[t]he inquiry into exempt status under § 213(a)(1) remains intensely fact bound and case specific."  *Bohn v. Park City Grp., Inc.*, 94 F.3d 1457, 1461 (10th Cir. 1996) (citation and internal modifications omitted).

In this case, Defendant alleges: (1) Plaintiff's position qualified for the FLSA's administrative exemption, *Motion* [#27] at 21-25; (2) Plaintiff's position as a Multimedia Experience Manager was exempt under the computer professional exemption, *id.* at 25-27; and (3) Plaintiff's role at the company qualified as exempt under a combination of the administrative and computer professional exemptions, *id.* at 27.

"In FLSA cases, a court must first determine the employee's primary duty, and then determine whether that primary duty disqualifies the employee from FLSA's protections." *Maestas v. Day & Zimmerman, LLC*, 664 F.3d 822, 827 (10th Cir. 2012) (citation omitted). "Time spent performing each duty is a 'useful guide' in examining which duty is primary, but there is no requirement that an exempt executive employee spend more than half h[is] time on managerial tasks." *Id.* (citing 29 C.F.R. § 541.700(b)).   "The regulations also require consideration of 'the relative importance of the exempt duties as compared with other types of duties; . . . the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.'" *Id.* (quoting § 541.700(a)). "Thus, for example, if an employee spends 40 percent of h[is] time performing managerial work and 60 percent on non-managerial work, the employee's managerial work may still be considered h[is] 'primary duty' if [ ]he enjoys a significant degree of independence and is paid a substantial premium for h[is] non-managerial work." *Id.* "Because the primary duty inquiry presents a question of fact, summary judgment is proper only if there [is] no genuine dispute regarding [Plaintiff's] primary duties." *Id.* at 828.

In this case there is no question that Plaintiff was compensated at a salary of at least $455 per week.  *See Defendant's First Requests for Admission to Plaintiff* [#27-37] at ¶ 13.

23

Therefore, the first element of the administrative employee exemption is satisfied.

"The second element—performing management or business operations—examines whether the employee performs work directly related to assisting with the running or servicing of the business, as distinguished from manufacturing or selling a product." *Baldwin v. Key Equip. Fin., Inc.*, No. 05-CV-0502-MSK-BNB, 2006 WL 2016843, at *10 (D. Colo. July 17, 2006) (citing 29 C.F.R. § 541.201(a)). The Code of Federal Regulations provides examples of typical administrative duties including: accounting; budgeting; auditing; quality control; marketing; research; personnel management; public relations; computer network, internet and database administration; and legal and regulatory compliance. *See* 29 C.F.R. § 541.201(b).

It is undisputed that Defendant "provides ministry resources" for individuals involved in "Christian ministry." *Rogers Aff.* [#27-2] at ¶ 2. To provide ministry resources, Defendant "publishes curriculum, books, magazines, websites, DVDs, CDs, kits, events, online training materials, and more to assist individuals and churches in their ministries." *Id.* In addition, the record makes clear that while employed at Defendant, Plaintiff:

- coordinated development and distribution of ebooks and mobile apps, *see Pltf's Depo Trans.* 70:14-71:14; *Pltf's Depo Ex. E* [#27-16] at 1; *Pltf's Depo., Ex. F & G* [#27-17] at 2;

- researched solutions to technical problems for customers and provided "Tier III" support, *Pltf's Depo. Trans.* [#27-3] at 88:11-1;

- created training materials for employees, *id.* at 93:19-21;

- trained other employees, *id.* at 92:20-93:15;

- advised business units about technology options, *id.* at 83:9-84:1;

- performed quality control checks on digital products, *id.* at 84:2-14; and

- partnered with business units to develop and support digital products, *id.* at 83:20-84:4.

Taken together, these tasks formed Plaintiff's primary duty.  While Plaintiff focuses his attention on tasks he performed that he claims were "tantamount to kicking the tires on an assembly line to make sure they are inflated up to specification," *Response* [#32] at 10, the Court's factual determination of Plaintiff's primary duty must take into consideration "the amount of time devoted to each task, the relative importance of each task, the degree of freedom from direct supervision, and the pay relative to subordinates." *Maestas*, 664 F.3d at 829.  Looking at "the character of [Plaintiff's] job as a whole," 29 C.F.R. § 541.700(a), the Court finds that even if Plaintiff's job included some work that would not qualify as non-manual work directly related to the management or business operations of Defendant, his primary duties were comprised of non-manual tasks directly related to assisting with the running or servicing of Defendant's business.[7]  Examining Defendant's primary business objectives and Plaintiff's primary duties, the Court concludes that the second element is met because Plaintiff's work in providing services both to other employees and to customers "was not akin to production or sale of a commodity; rather, [his] work was directly related to the general business operations of [Defendant]." *Hamby v. Associated Centers for Therapy*, 230 F.App'x 772, 784 (10th Cir. Feb. 13, 2007) (unpublished decision).

---

[7] While Plaintiff alleges in his affidavit that 65% of his work time was spent on a specific list of tasks, *Pltf's Aff.* [#32-2] at ¶¶ 61-62, such assertion is flatly contradicted by the evidence.  As noted above, the Court will disregard an affidavit if the Court concludes that it attempts to create a sham fact issue.  *See Law Co., Inc.*, 577 F.3d at 1169; *Ralston*, 275 F.3d at 973.  Accordingly, the Court will disregard Plaintiff's assertions in Plaintiff's Affidavit regarding the amount of time he spent on various tasks and, instead, relies on Plaintiff's deposition testimony and the other documentary evidence offered in this case.

In order for Plaintiff's job to be properly classified as exempt pursuant to the administrative employee exemption, Defendant must also show that Plaintiff exercised discretion and independent judgment with respect to matters of significance.  29 C.F.R. 541.202.  The Code of Federal Regulations defines "discretion and independent judgment" to require "comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered."   29 C.F.R. 541.202(a).   "The term 'matters of significance' refers to the level of importance or consequence of the work performed."  *Id.*  This factor must be applied in light of all the facts and circumstances.  Factors to consider in evaluating this factor include:

> whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.

29 C.F.R. § 541.202(b).  It is also important to note that "the exercise of discretion and independent judgment implies that the employee has authority to make an independent choice, free from immediate direction or supervision.  However, employees can exercise discretion and independent judgment even if their decisions or recommendations are reviewed at a higher level.  Thus, the term 'discretion and independent judgment' does not

require that the decisions made by an employee have a finality that goes with unlimited authority and a complete absence of review." 29 C.F.R. § 541.202(c). In addition, "the decisions made as a result of the exercise of discretion and independent judgment may consist of recommendations for action rather than the actual taking of action. The fact that an employee's decision may be subject to review and that upon occasion the decisions are revised or reversed after review does not mean that the employee is not exercising discretion and independent judgment." *Id.* Further, the "exercise of discretion and independent judgment must be more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources." 29 C.F.R. § 541.202(e).

Plaintiff's deposition testimony makes clear that he exercised discretion and independent judgment regarding matters of significance as an employee of Defendant. *See, e.g., Hamby*, 230 F.App'x at 784-85 (family advocate exercised discretion and independent judgment and was properly classified as exempt within the administrative exemption of the FLSA); *Hines v. State Room, Inc.*, 665 F.3d 235, 245-47 (1st Cir. 2011) (holding that individuals selling banquet events, who worked with discretion in helping customers select various options, exercised independent judgment and discretion regarding matters of significance to the employer and were properly classified as exempt pursuant to the FLSA); *Swartz v. Windstream Commn's, Inc.*, No. 10-3313, 429 F.App'x 102, at *2-3 (3rd Cir. May 25, 2011) (unpublished decision) (holding that employee who designed telecommunications systems for individual customers exercised discretion and independent judgment and was properly classified within the administrative exemption of the FLSA); *Talbert v. Am. Risk Ins. Co., Inc.*, 405 F.App'x 848, 854-55 (5th Cir. Dec. 20, 2010) (unpublished decision) (claims

adjuster who made recommendations regarding resolution of insurance coverage exercised discretion and independent judgment and was subject to the administrative exemption).  For example, among other things, Plaintiff created the training materials that were used to train other employees.  *Pltf's Depo. Trans.* [#27-3] at 93:19-21.  In addition, Plaintiff "identif[ied] and promote[d] solutions" at Defendant, including making suggestions with the goal of increasing efficiency.  *Id.* at 94:1-95:7.  Plaintiff also proposed the "Super-Hero group" training for other employees which was implemented by Defendant.  *Id.* at 97:6-13.  While this was approved by his supervisor, *id.* at 99:13-21, oversight by his supervisor does not detract from the discretion exercised by Plaintiff.  *See* 29 C.F.R. § 541.202(c).  In addition, Plaintiff was authorized to resolve customer problems with Defendant's digital products at the highest level on behalf of Defendant.  *Pltf's Depo. Trans.* [#27-3] at 88:11-1.  Accordingly, the Court finds that the third element of the administrative employee exemption is met and that Defendant properly classified Plaintiff as an exempt employee.

Because the Court concludes that Plaintiff was properly classified as an exempt employee pursuant to the administrative exemption, the Court will not address Defendant's argument regarding the computer professional exemption.

## 2.    Retaliation

Section 215 of the FLSA prohibits certain acts, including, discharging or discriminating "against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter . . ." 29 U.S.C. § 215(a)(3).  "FLSA retaliation claims are analyzed under the familiar three-pronged *McDonnell Douglas* framework."  *Pacheco v. Whiting Farms, Inc.*, 365 F.3d 1199, 1206 (10th Cir. 2004) (citation omitted); *see also Hamby*, 230 F.App'x at 785.  "Under the first

prong of the *McDonnell Douglas* framework, the employee must establish a prima facie case of retaliation by demonstrating (1) [he] engaged in protected activity under [the] FLSA, (2) [he] suffered an adverse employment action contemporaneous with or subsequent to the protected activity, and (3) a causal connection between the protected activity and the adverse employment action." *Id.* (citation omitted). "An employee's request for overtime wages is a protected activity in the form of an unofficial assertion of FLSA rights." *Id.* "An adverse employment action is a detrimental change in the terms or conditions of employment, such as termination." *Id.* (citation omitted). "An employee can demonstrate a causal connection between the protected activity and the adverse employment action directly or circumstantially." *Id.* (citation omitted). A causal connection can be demonstrated circumstantially through evidence that justifies an inference of retaliatory motive, such as a "very close" temporal proximity between the protected activity and adverse employment action. *Id.* (quoting *Conner v. Schnuck Markets, Inc.*, 121 F.3d 1390, 1394 (10th Cir. 1997)).

Plaintiff does not satisfy this prima facie standard. Regarding the first prong, Plaintiff's filing of his Complaint in this action on August 1, 2012, constituted protected opposition to discrimination.[8]   *See Hamby*, 230 F.App'x at 785 (filing claim for overtime wages constituted protected activity). As to the second prong, Plaintiff's termination constitutes an adverse employment action. *See Anderson v. Coors Brewing Co.*, 181 F.3d

---

[8]   The Court notes that the date Plaintiff first made Defendant aware of his claim regarding the classification of his job is unclear. *Compare Defendant's First Requests for Admission to Plaintiff* [#27-37] at ¶ 7 (deemed admitted due to Plaintiff's failure to respond) (Admit that before you filed this lawsuit you never complained to any more senior member of management or human resources at [Defendant] that you thought your position should be reclassified as non-exempt."); and *Rogers Aff.* [#27-2] at ¶ 12 ("The first time [Plaintiff] even indicated to [Defendant] that he thought he might be misclassified was in his demand letter dated May 10, 2012."). Construing the evidence in favor of Plaintiff, the Court will use the August 1, 2012 date for its analysis of the temporal proximity of his protected activity and the allegedly retaliatory conduct.

1171, 1178 (10th Cir. 1999).   Regarding the third prong, a causal nexus does not exist

between Plaintiff's complaint and Plaintiff's termination because almost four months elapsed

between Plaintiff's filing of the Complaint [#1] on August 1, 2012, and Plaintiff's termination

on November 29, 2012, and Plaintiff offers no additional evidence to establish causation.[9]

*See Anderson*, 181 F.3d at 1179 ("[W]e have held that a one and one-half month period

between protected activity and adverse action may, by itself, establish causation.   By

contrast, we have held that a three-month period, standing alone, is insufficient to establish

causation."); *O'Neal v. Ferguson Const. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001) ("Unless

there is very close temporal proximity between the protected activity and the retaliatory

conduct, the plaintiff must offer additional evidence to establish causation.").   In the absence

of any other evidence showing a causal connection between Plaintiff's protected activity and

his termination, Plaintiff has failed to established a prima facie case of retaliation.

However, even if Plaintiff made a prima facie showing of retaliation, his retaliation

claim would fail because Defendant has offered legitimate, non-discriminatory reasons for

terminating Plaintiff's employment. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-

04 (1973).   Defendant offered the following evidence regarding its termination of Plaintiff:

- On December 1, 2011, Plaintiff was given a written warning and placed on formal corrective action, *Pltf's Depo. Trans.* [#27-3] at 107:15-23; *T. Gilmour Aff.* [#27-6] at ¶ 6, *see generally December 2011 Memorandum* [#27-21];

- The written warning stated that Plaintiff must: "meet and exceed the responsibilities as outlined in [his] job description and conduct

---

[9]   Notably, Plaintiff's Response [#32] addresses Plaintiff's retaliation claim in only one paragraph which makes conclusory statements and relies entirely on Plaintiff's Affidavit for its claim that "there exist disputed issues of material fact" regarding Plaintiff's retaliation claim. *Response* [#32] at 8.

[him]self in a professional manner. . . . [I]f there isn't immediate and sustained improvement . . . as discussed above, . . . [he] may be subject to further corrective action, up to and including termination." *December 2011 Memorandum* [#27-21] at 3;

- On April 2, 2012, Plaintiff was given a final written warning regarding his job performance, *Pltf's Depo. Trans.* [#27-4] at 124:22-125:17; *T. Gilmour Aff.* [#27-6] at ¶ 9, *see generally April 2012 Memorandum* [#27-22];

- The final written warning stated: "Eli, this is your final written warning, understand that your job with Group Publishing is in jeopardy.  If there isn't immediate and sustained improvement in your behavior as discussed above or any further misconduct, you may be subject to further corrective action, up to and including termination."  *April 2012 Memorandum* [#27-22] at 1;

- Plaintiff was told to provide advance written notice for absences from work, *Pltf's Depo. Trans.* [#27-4] at 158:19-22;

- Defendant's employee handbook also informed all employees that "[v]acation time must be approved in advance by the [employee's] supervisor." *Defendant's Employee Handbook* [#27-24] at 2; *see also T. Gilmour Aff.* [#27-6] at ¶ 10 (stating that #27-24 is "a true and accurate copy of the Paid Vacations and Time Off page from [Defendant's] Handbook.");

- Plaintiff was aware of a meeting for which he was supposed to set up the audio-visual equipment on November 20, 2012, *Pltf's Depo. Trans.* [#27-4] at 162:17:163:4; *Kling Aff.* [#27-12] at ¶¶ 8-9;

- On Monday, November 19, 2012, Plaintiff sent an email to certain employees of Defendant stating, "I'll be out of the office, beginning tomorrow through the weekend, enjoying ALL of my kids home for [T]hanksgiving."  *Pltf's Depo. Trans.* [#27-4] at 165:16-166:5; *see generally November 19, 2012 Email* [#27-26];

- Plaintiff did not notify his supervisor, Gilmour, in advance that he planned to send this email or take additional days off beyond Thursday and Friday for the 2012 Thanksgiving holiday, *Pltf's Depo. Trans.* [#27-4] at 166:6-167:18; *T. Gilmour Aff.* [#27-6] at ¶ 10; and

- Plaintiff did not set up any audio-visual equipment for the November 20, 2012 meeting, and he did not arrange for anyone else to do so, *Pltf's Depo. Trans.* [#27-4] at 164:11-16.

Defendant's evidence regarding Plaintiff's failure to conduct himself properly as an employee and his failure to provide notice to his supervisor, Gilmour, prior to scheduling days off constitute legitimate, non-discriminatory reasons for terminating Plaintiff's employment.

Where, as here, Defendant has offered a legitimate, non-discriminatory reason for terminating Plaintiff's employment, the burden shifts back to Plaintiff, who must prove that Defendant's proffered reason is pretextual. *McDonnell Douglas Corp.*, 411 U.S. at 802-04. "[Plaintiff] can establish pretext by pointing to weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons." *Kirkpatrick v. Pfizer, Inc.*, 391 F. App'x 712, 721 (10th Cir. 2010) (quoting *Mickelson v. N.Y. Life Ins. Co.*, 460 F.3d 1304, 1315 (10th Cir. 2006)) (internal quotation marks omitted).  Plaintiff fails to allege any such deficiencies.  Indeed, Plaintiff's only attempt to show pretext lies in his conclusory declaration that "[t]he purported reason for discharge was pretextual." *Am. Compl.* [#22] at 3.  The Court finds this conclusory declaration inadequate.  *See Ford v. West*, 222 F.3d 767, 777 (10th Cir. 2000) ("Vague, conclusory statements do not suffice to create a genuine issue of material fact."); *Branson*, 853 F.2d at 772 (stating that "mere conjecture" of pretext is an insufficient basis for denial of summary judgment).  Plaintiff has failed to provide any specific facts to support his belief that the reasons Defendant offers for Plaintiff's termination were pretextual and, beyond vague speculation and nebulous generalities, the record reveals a lack of evidentiary support for such a proposition. Accordingly, Plaintiff cannot carry the burden of showing that Defendant's proffered reasons for terminating Plaintiff's employment were pretextual.  Accordingly, Defendant is entitled

to summary judgment on both Plaintiff's FLSA claim and his retaliation claim.

## IV.  Conclusion

For the foregoing reasons,

IT IS HEREBY **ORDERED** that the Motion [#27] is **GRANTED**.

IT IS FURTHER **ORDERED** that the Clerk of the Court shall enter judgment in favor of Defendant and against Plaintiff as to all claims.

IT IS FURTHER **ORDERED** that the three-day Trial set to commence on September 24, 2013 is **VACATED**.

IT IS FURTHER **ORDERED** that this case is **DISMISSED with prejudice**.

Dated: September 13, 2013                    BY THE COURT:

Kristen L.  Mix
United States Magistrate Judge